1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

BOARD OF TRUSTEES OF THE KEN
LUSBY CLERKS & LUMBER
HANDLERS PENSION FUND,

Case No.  13-cv-03898-HSG

8

Plaintiff,

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

9
10

v.

11

PIEDMONT LUMBER & MILL
COMPANY, et al.,

Re: Dkt. No. 101

12

Defendants.

13          Plaintiff Board of Trustees of the Ken Lusby Clerks & Lumber Handlers Pension Fund

14  (the "Board") filed this action to recover a $1,660,266 withdrawal liability assessment imposed by

15  ERISA when Defendant Piedmont Lumber & Mill Company ("Piedmont") withdrew from

16  participation in the Ken Lusby Clerks & Lumber Handlers Pension Plan (the "Plan").  The

17  Defendants in this action are Piedmont, William Myer, Jr., and Wendy Oliver, each of whom the

18  Board alleges are jointly and severally liable for the withdrawal liability assessment.

19          Pending before the Court is the Board's Motion for Summary Judgment against all

20  Defendants.  *See* Dkt. No. 101 ("Mot.").  The Court has carefully considered the arguments and

21  evidence offered by the parties, both in their written submissions to the Court and during the

22  hearing on this motion.  For the reasons discussed below, the Court **GRANTS** Plaintiff's Motion

23  for Summary Judgment.

24   **I.   FACTUAL BACKGROUND**

25          The Ken Lusby Clerks & Lumber Handlers Pension Fund (the "Fund") provides retirement

26  benefits for employees on whose behalf employers make contributions.  The parties do not dispute

27  that Piedmont participated as an employer in the Fund until it terminated its operations and

28  liquidated its assets in 2010.  Shortly after Piedmont closed, the Board determined that its closure

United States District Court
Northern District of California

constituted a complete withdrawal from the Fund and, on November 29, 2010, sent a notice and demand letter for payment of a $1,660,266 withdrawal assessment. Strauss Decl., Ex. 66. The letter was directed to Piedmont and "each person and entity under common control with it" and set forth a payment schedule for the assessment. *Id.* The Board sent another demand in January of 2011, *id.*, Exh. 68, and—after failing to receive Piedmont's first scheduled payment—an overdue notice the following month, *id.*, Exh. 69. While Piedmont's attorney signed for several of these letters, *id.*, Exh. 67, 70, Piedmont never requested review of its withdrawal liability or initiated arbitration, and no part of the withdrawal liability has been paid to date.[1]

At all times relevant to this action, Piedmont was jointly owned by Myer, its President and CEO, and Oliver, Myer's sister, as trustee of the Oliver Family Trust. *See* SAC ¶¶ 9-10; Dkt. No. 66 ¶¶ 9-10. Myer arranged for the purchase of a property located at 2345 South Main Street in Lakeport, California (the "Lakeport Property"), *see* Dkt. No. 108 ("Opp.") at 7, which was also jointly owned by Myer and Oliver as trustee of the Oliver Family Trust at all times relevant to this action, *see* Strauss Decl., Exhs. 23-24. Beginning by no later than 2005 and continuing through the termination of Piedmont's operations, the Lakeport Property was rented to Piedmont and other commercial tenants. *See* Strauss Decl., Ex. 5 (Deposition of Edward P. Smith) at 41:10-17 (testimony from the Chief Financial Officer of Piedmont stating that the company paid $1,500 in rent per month for its subsidiary's use of the Lakeport Property).[2] The tax records produced by

---

[1] The Court overrules Oliver's blanket objection to the authenticity of the letters sent by the Board notifying Piedmont of the withdrawal assessment. Under Federal Rule of Evidence 904(b)(4), a document may be authenticated based on its "appearance, contents, substance, internal patterns, or other distinctive characteristics . . . taken together with all the circumstances." The Court finds that the contents of the letters and their production from Piedmont's own files during discovery provide a sufficient basis for authentication under Rule 904(b)(4).

[2] The Court overrules Oliver's objection to the excerpts from Edward Smith's deposition, which were lodged on the ground that the Board failed to append the court reporter's certification. Opp. at 23. The Court notes that Oliver herself filed that certification in connection with her opposition to the Board's motion. Dkt. No. 110-1 at 7. Accordingly, to the extent the absence of that certification presented an obstacle to the consideration of Mr. Smith's testimony, that obstacle was removed by Oliver's filing. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 776 (9th Cir. 2002) ("[W]hen a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties.").

2

Oliver's tax preparer, Carole Keane & Associates, document the rental income and related expenses of the Lakeport Property. *See* Strauss Decl., Exhs. 32, 71-76.[3]  $127,125 of the rent received from 2005 through 2010 was paid by Piedmont.  *See* Strauss Decl., Exh. 13 (Expert Report of Lawrence Wood, CPA, CFP) at Exhibit C.[4]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Material facts are those that may affect the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *See id.*  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden."  *Id.* at 254.  The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not."  *Id.*

---

[3] The Court overrules Oliver's objection that these documents are unauthenticated.  All seven documents were produced by Oliver's agent during discovery, which is sufficient authentication when offered against Oliver given the absence of adverse interests between Oliver and her agent. *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 972-73 (C.D. Cal. 2006) (finding documents produced by party's business partners authentic where their interests were not adverse); *In re Homestore.com, Inc. Sec. Litig.*, 347 F. Supp. 2d 769, 781 (C.D. Cal. 2004) (finding documents produced by corporation's auditor authenticated by virtue of production in discovery when offered against the corporation's CEO).  Notably, Oliver does not argue that the documents produced by Carole Keane & Associates are anything but what they appear to be— records reflecting the rental income and expenses related to the Lakeport Property.

[4] The Court overrules Oliver's objection to the Wood Report's compilation of the rental income paid by Piedmont for use of the Lakeport Property.  The table upon which the Board relies for the $127,125 figure was computed from amounts contained in a document produced by Oliver in this litigation.  *See* Wood Report at Exh. C (citing document bates labeled WO 000032-54); Dkt. No. 117 (Reply Declaration of Sean Strauss), Exh. 81 (Register Report of Lakeport Property). Accordingly, Mr. Wood's calculations were based on admissible evidence.  *See, e.g., Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n. 12 (9th Cir.1996) (documents produced by a party in discovery deemed authentic when offered by the party-opponent).  The Court finds that compiling the rents paid from the register and providing a summary is proper expert testimony under Federal Rule of Evidence 702 that would assist the trier of fact.  *See, e.g., Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, No. 13-cv-5242-LAP, 2015 WL 1499449, at *1 (S.D.N.Y. Mar. 31, 2015) ("While a juror may be able to understand each individual source that Matlins cites, Matlins 'synthesizes this material and pulls together common themes in reaching his conclusions.'") (citation omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

1 "[A]ll justifiable inferences must be drawn in [the nonmovant's] favor." *See United Steelworkers*

2 *of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir. 1989) (en banc) (citation omitted).

3          The moving party must inform the district court of the basis for its motion and identify

4 those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if

5 any, that it contends demonstrate the absence of a genuine issue of material fact. *See Celotex*

6 *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A party opposing motion for summary judgment

7 "may not rest upon the mere allegations or denials of [that] party's pleading, but . . . must set forth

8 specific facts showing that there is a genuine issue for trial." *See* Fed. R. Civ. P. 56(e); *see also*

9 *Liberty Lobby*, 477 U.S. at 250.  The opposing party need not show the issue will be resolved

10 conclusively in its favor. *See id.* at 248-49.  All that is necessary is submission of sufficient

11 evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the

12 parties' differing versions at trial.  *See id.*

13          "Where the determination of whether an activity constitutes a trade or business under 29

14 U.S.C. § 1301(b)(1) is ultimately a question of the characterization of a group of undisputed facts,

15 it is properly resolved by summary judgment." *Pension Trust Fund for Operating Engineers v.*

16 *Tractor Equip. Sales*, No. 12-cv-01056-WHO, 2014 WL 5810097, at *3 (N.D. Cal. Nov. 7, 2014)

17 (citations omitted).

18 **III.    DISCUSSION**

19          Pension plans like the Fund are federally regulated under ERISA, 29 U.S.C. § 1001 *et seq*.

20 The MPPAA, 29 U.S.C. § 1381 *et seq.*, amended ERISA to allow pension plans "to impose

21 proportional liability on withdrawing employers for the unfunded vested benefit obligations of

22 multiemployer plans." *Carpenters Pension Trust Fund for N. California v. Underground Const.*

23 *Co., Inc.*, 31 F.3d 776, 778 (9th Cir. 1994).  Where a withdrawing employer's past contributions

24 are insufficient to fund pension plan obligations that have already vested, the amendments permit

25 plans "to make withdrawing employers pay their proportionate share of the deficit such that

26 remaining employers [will] not be unfairly saddled with increased payments." *Id*.

27          This "withdrawal liability" is assessed against the withdrawing "employer," a term which

28 includes not only the entity obligated to contribute to the pension plan, but also all "trades or

4

United States District Court
Northern District of California

businesses" that are under "common control" with that entity.  *See* 29 U.S.C. § 1301(b)(1).

Congress enacted section 1301(b)(1) "to prevent businesses from shirking their ERISA obligations

by fractionalizing operations into many separate entities."  *Teamsters Pension Trust Fund-Bd. of*

*Trustees of W. Conference v. Allyn Transp. Co.*, 832 F.2d 502, 507 (9th Cir. 1987).  Under the

section 1301(b)(1) framework, withdrawal liability may be imposed against an entity other than

the one obligated to contribute to the pension plan so long as (1) the entity is under "common

control" with the withdrawing entity; and (2) the entity is a "trade or business."  *See* 29 U.S.C. §

1301(b)(1).  All entities within the controlled group are jointly and severally liable for each other's

withdrawal liability.  *See Bd. of Trustees of W. Conference of Teamsters Pension Trust Fund v.*

*Lafrenz*, 837 F.2d 892, 893 (9th Cir. 1988)

There is no dispute that Piedmont and Myer, neither of whom opposed the Board's motion

for summary judgment, are liable for the withdrawal assessment.  Oliver opposes summary

judgment against her on three grounds: (1) the leasing activities at the Lakeport Property were not

under the same "common control" as Piedmont; (2) those leasing activities did not constitute a

"trade or business;" and (3) even assuming the Court disagrees with her first two arguments,

Oliver cannot be held personally liable for the withdrawal assessment because the Oliver Family

Trust owned the interest in the Lakeport Property.  The Court addresses each argument in turn.

### A.   Piedmont and the Lakeport Property were Under Common Control

Oliver asserts that the Board cannot prevail on summary judgment because it has not

produced admissible evidence demonstrating that Myer and the Oliver Family Trust exercised

common control over both Piedmont and the Lakeport Property.  Opp. at 18-20.  Common control

for purposes of Section 1301(b) is defined in 26 C.F.R. 1.414(c)-2 and 1.414(c)-4.  *See* 29 U.S.C.

§ 1301(b)(1) ("The regulations prescribed [to determine common control] shall be consistent and

coextensive with regulations prescribed for similar purposes by the Secretary of the Treasury

under section 414(c) of Title 26.").  Common control requires that the same group of people or

organizations (1) own a *controlling interest* in each business alleged to be under common control,

and (2) accounting only for identical ownership, the same group of people or organizations are in

*effective control* of each business alleged to be under common control.  26 C.F.R. 1.414(c)–2(a),

5

(c).  Section 1.414(c)-2(a) defines common control as "any group of trades or businesses which is . . . a 'brother-sister group of trades or businesses under common control' as defined in paragraph (c) of this section."  Section 1.414(c)–2(c) defines a brother-sister group as "two or more organizations conducting trades or businesses if (i) the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of § 1.414(c)–4) a controlling interest in each organization, and (ii) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each such organization, such persons are in effective control of each organization."

The Board has produced numerous documents and deposition testimony demonstrating that Oliver and Myer's complete ownership of both Piedmont and the Lakeport Property satisfy this standard.  Oliver has objected to the vast majority of this evidence as unauthenticated or hearsay.  However, the Court need not reach these evidentiary objections because the ownership of both Piedmont and the Lakeport Property are established through Oliver's own admissions and uncontested public records.[5]

As to the Lakeport Property, Oliver does not appear to contest that Myer and the Oliver Family Trust own the Lakeport Property, which Myer purchased with assets inherited from their mother's trust.  Opp. at 7.  Lake County records—to which Oliver has not objected—confirm that Myer and the Oliver Family Trust are the owners of that property.  *See* Strauss Decl., Exh. 23 (Lake County Assessor Inquiry listing William Myer, Jr. and Wendy M. Oliver Trustee as the owners of the Lakeport property); *id.*, Exh. 24 (Deed of Real Property conferring title to the Lakeport Property to Myer and Oliver as trustee of the Oliver Family Trust).

Oliver's opposition does contest that summary judgment is warranted as to the Oliver Family Trust's ownership of Piedmont.  *See* Opp. at 5-7 (arguing that the Oliver's ownership of Piedmont is unclear).  However, Oliver's Answer to the SAC admitted the allegation that "[a]t all relevant times . . . Myer [was] the holder of 68% of the voting stock of Piedmont . . . and [t]he Oliver Family Trust . . . [was] the holder of 32% of the voting stock of defendant Piedmont."

---

[5] All objections to evidence not considered in this opinion are overruled as moot, as the challenged evidence did not form the basis of the Court's opinion.

United States District Court
Northern District of California

SAC ¶¶ 9-10; Dkt. No. 66 ¶¶ 9-10; *see also American Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988) ("Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.").  In addition, each of Oliver's contributions to the Joint Case Management Statements filed in this case represent that Myer and the Oliver Family Trust jointly owned Piedmont.  *See* Dkt. No. 55 at 3 (May 1, 2014) ("Defendants Myer and the Oliver Family Trust are the current owners of [Piedmont]."); Dkt. No. 92 at 3 (Mar. 2, 2015) ("Defendants Myer and the Oliver Family Trust are the current owners of the defunct company.").  Oliver may not move the goal posts by contesting at summary judgment—for the very first time—that she (as trustee of the Myer Family Trust) and Myer jointly own Piedmont.  *See Hoffman v. Geico Ins. Co.*, 347 Fed. App'x 295, 296-97 (9th Cir. 2009) ("The district court did not err by preventing GEICO from amending its judicial admission after discovery closed.").

Accordingly, the Court finds that there is no material dispute of fact that Myer and Oliver (as trustee of the Oliver Family Trust) owned and commonly controlled both the Lakeport Property and Piedmont.

### B.     The Lakeport Property is a Trade or Business

ERISA does not define the term "trade or business" as it is used in Section 1301(b)(1).  *See Lafrenz*, 837 F.2d at 894 n.6.  Section 1301(b)(1) provides that the phrase "trades or businesses (whether or not incorporated) which are under common control" has the same meaning as that provided in the regulations promulgated under section 414(c) of the Internal Revenue Code.  29 U.S.C. § 1301(b)(1).  However, "trade or business" is not defined in either section 414(c) or the regulations promulgated thereunder.  *See Lafrenz*, 837 F.2d at 894 n.6 (observing the same).  The Ninth Circuit has provided little guidance as to what constitutes a "trade or business" under section 1301(b)(1), except to note that it is an "essentially factual inquiry."  *Id*.  In the absence of clear authority, the parties propose different tests for determining whether the Lakeport Property's leasing activities qualify as a trade or business.

Oliver argues that the Court should determine whether the Lakeport Property constitutes a trade or business by applying the test articulated in *Commissioner v. Groetzinger*, 480 U.S. 23

1    (1987).  In *Groetzinger*, the Supreme Court interpreted Internal Revenue Code sections 62(1) and

2    162(a) to require that an activity must be performed (1) for the primary purpose of income or

3    profit, and (2) with continuity and regularity, to be considered "trade or business." 480 U.S. at 35.

4    The Court distinguished between "a sporadic activity, a hobby, or an amusement diversion," on

5    the one hand, and a trade or business, on the other.  *Id*.  The Seventh Circuit has adopted the

6    *Groetzinger* test for determining whether an activity is a trade or business under section

7    1301(b)(1), *Fulkerson*, 238 F.3d at 895, as has the D.C. Circuit, *Connors v. Incoal, Inc.*, 995 F.2d

8    245, 251 (D.C. Cir. 1993).

9         The Ninth Circuit has not followed suit.  In *Lafrenz*—decided shortly after *Groetzinger*—

10   the court conducted a trade or business analysis without reference to *Groetzinger*.  *See* 837 F.2d at

11   893-95.  With one exception, recent cases in this district have either expressly declined to apply

12   *Groetzinger* in making section 1301(b)(1) determinations, or, like *Lafrenz*, have made them

13   without reference to *Groetzinger* at all. *See Pension Trust Fund for Operating Engineers*, 2014

14   WL 5810097, at *7-12 (collecting cases); *Carpenters Pension Trust Fund for N. California v.*

15   *Lindquist,* No. 10-cv-03386-SC, 2011 WL 2884850, at *4 n.7 (N.D. Cal. July 19, 2011), *aff'd*,491

16   Fed. App'x. 830 (9th Cir. 2012) ("[T]he Ninth Circuit has not adopted [the *Groetzinger* test], and

17   the Court declines to do so here.").  *But see Bakery & Confectionery Union & Indus. Int'l Pension*

18   *Fund v. Wilson,* No. 09-cv-00256-JF, 2009 WL 1357409, at *2 (N.D. Cal. May 13, 2009) (relying

19   on *Groetzinger* when conducting a section 1301(b)(1) analysis).  Moreover, the Supreme Court in

20   *Groetzinger* cautioned that its "interpretation of the phrase 'trade or business' is confined to the

21   specific sections of the [Internal Revenue] Code at issue here.  We do not purport to construe the

22   phrase where it appears in other places." 480 U.S. at 27 n.8.  Accordingly, the Court follows the

23   Ninth Circuit's decision in *Lafrenz* and declines to apply the test established in *Groetzinger* to

24   section 1301(b)(1).

25        Here, the evidence shows that Myer and the Oliver Family trust leased the Lakeport

26   Property to Piedmont from 2005 through 2010, receiving over $120,000 in rent.  Wood Report at

27   Exh. C; *see also* Strauss Decl., Exh. 5 (Deposition of Edward P. Smith) at 41:10-17 (Piedmont

28   paid $1,500 in rent per month for its subsidiary's use of the Lakeport Property).  There is no basis

United States District Court
Northern District of California

8

United States District Court
Northern District of California

for distinguishing this case from *Lafrenz* or the numerous other cases that have found property leases between two commonly controlled entities to constitute a trade or business under section 1301(b)(1).  *See Lafrenz*, 837 F.2d at 893 (finding a trade or business where the commonly controlled entity leased two trucks back to the withdrawing employer for profit); *Lindquist*, 2011 WL 2884850, at *5 (finding a trade or business where the commonly controlled entity "leased the 1701 Property to the Company for nearly seven years and received $2,000 per month in revenue from the leasing arrangement"); *see also Cent. States Se. & Sw. Areas Pension Fund v. Messina Products, LLC*, 706 F.3d 874, 881-83 (7th Cir. 2013) ("[L]easing property to a withdrawing employer itself is categorically a trade or business"); *Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Delaware Valley Sign Corp.*, 945 F. Supp. 2d 649, 653 (E.D. Va. 2013) ("Although the Fourth Circuit has not yet addressed this issue, those circuit and district courts that have done so are in accord that renting property to a withdrawing employer is 'categorically' a trade or business.") (citation omitted).

    Oliver's argument that her involvement with the Lakeport Property was minimal does not preclude a finding that its leasing activities constituted a "trade or business."  For example, the defendants in *Lafrenz* leased only two trucks back to the withdrawing employer, while the defendant in *Lindquist* leased a single commercial property and testified that someone else "took care of all operations at the property" and that he "spent less than [five] hours per year" dealing with it.  *Lindquist*, 2011 WL 2884850, at *5.  Both decisions still found the leasing operations to constitute a trade or business under section 1301(b)(1).  As repeatedly stated by courts conducting the "trade or business" analysis under section 1301(b)(1), "the fact that one of the entities bore nearly all the responsibilities under the lease [does] not insulate the other from being treated as a 'trade or business' for purposes of § 1301(b)(1)."  *United Food v. Progressive Supermarkets*, 644 F.Supp. 633, 639 (D.N.J. 1986) (quoting *Pension Benefit Guaranty Corp. v. Cent. City Motors*, 609 F.Supp. 409, 412 (S.D. Cal. 1984)).  In other words, that Oliver effectively delegated the day-to-day activities "related to the property does not transform [the] leasing operation from a trade or business into a passive investment."  *Linquist*, 2011 WL 2884850, at *6.  The dispositive factor in the Court's analysis is that the Lakeport Property was leased back to the commonly controlled

United States District Court
Northern District of California

1    withdrawing employer, an economic relationship that numerous courts have held categorically

2    constitutes a trade or business under section 1301(b)(1).

3           Accordingly, the commonly controlled Lakeport Property leasing operation poses exactly

4    the type of "fractionalization threat" that section 1301(b)(1) was designed to address.  2011 WL

5    2884850 at *7.   The Court finds that there is no material dispute of fact that the leasing activities

6    of the Lakeport Property constituted a "trade or business" under that section.

7                **C.    Oliver is Individually Liable for the Withdrawal Assessment**

8           Finally, Oliver argues that she may not be held individually liable for the withdrawal

9    assessment because the Board has not demonstrated that the alter-ego theory of liability can be

10   applied to a trust or that Oliver failed to follow the formalities required to pierce the corporate veil.

11   Opp. at 21.  Oliver's opposition misses the salient legal issue.  Oliver has conceded—both in her

12   pleadings and in her responses to the Board's Interrogatories—that the Oliver Family Trust is a

13   revocable trust and that Oliver is the grantor and sole beneficiary.  *See* Dkt. No. 18 ¶ 32; Dkt. No.

14   66 ¶ 40; Strauss Decl., Exh. 91 at 5 ("The [Oliver Family Trust] is a revocable trust.  Wendy M.

15   Oliver is the grantor and sole beneficiary of the trust.").  Revocable trusts, unlike corporations (to

16   which the alter-ego and veil piercing doctrines apply), are not legal entities.  *Galdjie v. Darwish*,

17   113 Cal. App. 4th 1331, 1343 (2003); *see also id*. ("Legal title to property owned by a trust is held

18   by the trustee, and common law viewed the trustee as the owner of the trust's property.").

19          Accordingly, the Board need not establish alter-ego liability or pierce the corporate veil for

20   Oliver to be held individually liable.  Instead, "[t]here is no distinction in California law between

21   property owned by the revocable trust and property owned by the settlor of such a revocable trust

22   during the lifetime of the settlor."  *Carolina Cas. Ins. Co. v. L.M. Ross Law Grp., LLP*, 184 Cal.

23   App. 4th 196, 208 (2010) (citations omitted); *cf. Galdjie*, 113 Cal. App. 4th at 1344 ("Assuming

24   that a contract made by a trustee is within his powers, express or implied, it is generally held that

25   the trustee is personally liable upon such a contract.") (quoting Bogert, Trusts & Trustees (2d ed.

26   rev. 1982) § 711, p. 255).  In fact, because a trust is not a legal entity and has no capacity to sue or

27   be sued, *id*. at 1343-45, Oliver is the only proper defendant for liabilities incurred by the Oliver

28   Family Trust.  At least one other court has found a grantor of a revocable family trust individually

10

1    liable for a similar ERISA withdrawal liability triggered by the withdrawal of an employer

2    partially owned by the trust.  *See Vaughn v. Sexton*, 975 F.2d 498, 504, n.4 (8th Cir. 1992)

3    (holding defendant individually liable because he was the grantor, a trustee, and a beneficiary of

4    the revocable family trust responsible for the withdrawal liability).[6]

5         Accordingly, the Court finds that there is no material dispute of fact that Oliver is jointly

6    and severally liable for the assessment triggered by Piedmont's withdrawal from the Fund.

7         **D.    Damages**

8         The Board seeks an award of (1) the unpaid withdrawal liability; (2) interest on the unpaid

9    withdrawal liability; (3) liquidated damages; and (4) attorneys' fees and costs.  The Court agrees

10   with the Board that it is entitled to these categories of damages.  Title 29 U.S.C. § 1451 provides

11   that, "[i]n any action under this section to compel an employer to pay withdrawal liability, any

12   failure of the employer to make any withdrawal liability payment within the time prescribed shall

13   be treated in the same manner as a delinquent contribution (within the meaning of section 1145 of

14   this title)."  29 U.S.C. § 1451(b).  In actions involving delinquent contributions pursuant to section

15   1145, the following damages are to be awarded: unpaid contributions, interest on the unpaid

16   contributions, liquidated damages as provided by the plan (not to exceed 20% of the unpaid

17   contributions), and reasonable attorneys' fees and costs.  *See id*. § 1132(g)(2); *see also Bd. of*

---

[6] Oliver has identified no authority suggesting that her individual liability (or the Board's access to
the funds held in the Oliver Family Trust's name) is affected by whether her children are also
beneficiaries of the Oliver Family Trust.  Opp. at 21.  The California Probate Code suggests the
Court's analysis would be the same regardless of the Trust's beneficiaries, so long as Oliver
retained the power to revoke the trust in whole or in part.  *See* Cal. Prob. Code § 18200 ("If the
settlor retains the power to revoke the trust in whole or in part, the trust property is subject to the
claims of creditors of the settlor to the extent of the power of revocation during the lifetime of the
settlor.").  However, the Court does not reach this question because it finds that Oliver's new
assertion that her children are beneficiaries—which flatly contradicts three separate sworn
statements explicitly declaring the contrary, Dkt. No. 18 ¶ 32; Dkt. No. 66 ¶ 40; Strauss Decl.,
Exh. 91 at 5—to constitute sham testimony solely intended to create a triable issue of fact in
advance of summary judgment.  *Hilderman v. Enea TekSci, Inc*., No. 05-cv-1049-BTM, 2008 WL
2263058, at *1 (S.D. Cal. June 2, 2008) ("Under the 'sham affidavit' rule, a party cannot create a
triable issue of fact by introducing a sham affidavit that contradicts his prior deposition testimony
or interrogatory responses.") (citing *School District No. 1J, Multnomah County, Oregon v.
ACandS, Inc*., 5 F.3d 1255, 1264 (9th Cir. 1993).  Accordingly, the Court will disregard Oliver's
new factual assertion that her children are beneficiaries of the Oliver Family Trust.

United States District Court
Northern District of California

*Trustees of Carpenter Trust Fund for N. California v. JKJ, Inc*., No. 09-cv-0636-PJH, 2010 WL 373819, at *6 (N.D. Cal. Jan. 29, 2010) (noting that ERISA requires the award of these categories of damages); *Cent. States, Se. & Sw. Areas Pension Fund v. Slotky*, 956 F.2d 1369, 1377 (7th Cir. 1992) (noting plaintiffs in a withdrawal liability action are entitled to interest, liquidated damages, and attorneys' fees because section 1451 assimilates section 1145).

Oliver does not contest that the Board is entitled to these categories of damages in the amount requested by the Board should it prevail on its claims.  Accordingly, the Court finds that the Board is entitled to (1) the withdrawal assessment of $1,660,266; (2) prejudgment interest of $545.84 per day beginning from January 28, 2011 and ending on the date of final judgment; (3) liquidated damages in an amount equal to the amount payable as prejudgment interest; and (4) reasonable attorneys' fees and costs.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Board's Motion for Summary Judgment against Piedmont, Myer, and Oliver.  Piedmont, Myer, and Oliver are jointly and severally liable for the amounts described in Section III.D of this order.  The Board must submit a motion for reimbursement of its reasonable attorney's fees and costs no later than **21 days** from the date of this order.  The clerk is directed to enter judgment in favor of Board of Trustees of the Ken Lusby Clerks & Lumber Handlers Pension Fund and close the file.

**IT IS SO ORDERED.**

Dated:  September 16, 2015

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

12